**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **DAIRY CONSULTING, INC.,** | : | |
| | : | **Bankruptcy No. 04-23238-MBM** |
| Debtor. | : | |

..................................................................:..................................................................

| | | |
|---|---|---|
| **Natalie Lutz Cardiello, Chapter 7** | : | |
| **Trustee for the Estate of Dairy** | : | |
| **Consulting, Inc.,** | : | **Chapter 7** |
| Plaintiff, | : | |
| | : | |
| v. | : | **Adversary No. 06-2365-MBM** |
| | : | |
| **Fike's Dairy, Inc., f/k/a R. Bruce** | : | |
| **Fike & Sons Dairy, Inc.,** | : | |
| Defendant. | : | |

Appearances:    Scott M. Hare, for Natalie Cardiello, the Chapter 7 Trustee.
George J. Marcus, for Fike's Dairy, Inc.

## <u>MEMORANDUM OPINION</u>

Natalie Lutz Cardiello, the Chapter 7 Trustee for the bankruptcy estate of

Dairy Consulting, Inc., the instant debtor (hereafter respectively "the Trustee" and

"the Debtor"), moves for partial summary judgment on her complaint, and, in

particular, summary judgment with respect to Count 1 therein.  The Trustee, in

her Count 1, asserts a claim, possessed pre-petition by the Debtor, for an alleged

breach by Fike's Dairy, Inc. (hereafter "Fikes") of a contract between the Debtor

and Fikes.  The contract alleged to have been breached by Fikes is that entitled

"Marketing Consulting Agreement," which agreement (a) was entered into on

May 28, 1997 (hereafter "the MCA"), and (b) was supplemented by – indeed, the

terms of which were expressly incorporated by reference into – a letter

agreement also executed on that same date (hereafter "the Letter Agreement").

The Court, by Judgment Order dated July 12, 2007 (hereafter "the Judgment Order"), ruled in the Trustee's favor on her Count 1, that is the Court thereby granted the Trustee's partial summary judgment motion.  The Court, by way of the Judgment Order, also simultaneously denied Fikes' cross-motion for summary judgment with respect to the Trustee's Count 1.  By virtue of prevailing on her Count 1, the Court, in the last sentence of the Judgment Order, awarded to the Trustee contract breach damages of $926,217.56, plus interest at the rate of 6% from March 1, 2004.[1]

Fikes subsequently appealed the Judgment Order to the District Court, which court, by a Memorandum Order dated November 1, 2007, vacated the Judgment Order, and then remanded so that this Court could explain the reasons for its decision.  For the reasons set forth below, the Court reinstates its prior decision in favor of the Trustee as embodied in the Judgment Order, except that the Court need not, and thus will not, reinstate its determination therein that the Trustee's Count 1 is a core proceeding.[2]

---

[1]The parties, on July 6, 2007, stipulated to the dismissal of the Trustee's claim set forth in the Trustee's Count 2, which count constitutes the lone count in the Trustee's complaint in addition to the Trustee's Count 1.  Such dismissal was without prejudice to the Trustee's right to assert the claim in such Count 2 in a separate arbitration proceeding.

[2]The Court sees no point in reinstating or justifying its determination in the Judgment Order that the Trustee's Count 1 is a core proceeding because (a) the Court disposed therein, and disposes herein, of such Count 1 entirely by way of summary judgment, (b) the Court, therefore, abstained and abstains from making any findings regarding genuinely disputed facts, see In re Stipetich, 294 B.R. 635, 651 (Bankr.W.D.Pa. 2003); In re ACR Management, L.L.C., 329 B.R. 142, 144 n.1 (Bankr.W.D.Pa. 2005), (c) the Court, therefore, also only drew and draws legal conclusions, see Id., (d) legal conclusions are subjected to de novo review

2

## SUMMARY JUDGMENT STANDARD

The law regarding summary judgment adjudication is succinctly set forth

as follows:

> On a summary judgment motion, the movant must show that
>
> "there is no genuine issue as to any material fact and that the
>
> moving party is entitled to a judgment as a matter of law."
>
> Fed.R.Civ.P. 56(c).  Once the movant satisfies this initial burden,
>
> then the non-movant must respond with information to the contrary
>
> or it will lose.  Fed.R.Civ.P. 56(e).

National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1581-1582 (3rd

Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S.Ct. 2548,

2552-54, 91 L.Ed.2d 265 ([U.S.] 1986)).  "If the nonmoving party has the burden

of persuasion at trial, [then] 'the party moving for summary judgment may meet

its burden [of showing that it is entitled to a judgment as a matter of law] by

showing that the evidentiary materials of record, if reduced to admissible

evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'"

Jalil v. Avdel Corp., 873 F.2d 701, 706 (3rd Cir. 1989) (citing Chipollini v.

Spencer Gifts, Inc., 814 F.2d 893, 896 (3rd Cir. 1987), which case, in turn, cites

---

by a district court on appeal regardless of whether they are rendered, on the one
hand, within a core proceeding, or, on the other hand, within a noncore
proceeding, *see* Id., and (e) it thus matters not, solely with respect to the Court's
decision to grant summary judgment in the Trustee's favor on her Count 1,
whether such count is a core proceeding (the core/noncore distinction would only
matter if the Trustee's Count 1 were to reach the trial stage).  Therefore, the
Court will simply refrain from reinstating its determination in the Judgment Order
that the Trustee's Count 1 is a core proceeding.

3

Celotex, 477 U.S. 317, 106 S.Ct. at 2555); *see also* Celotex, 477 U.S. at 323,

106 S.Ct. at 2552 (same).

> Where the party moving for summary judgment is the
>
> plaintiff, or the party who bears the burden of proof at trial, the
>
> standard is more stringent.  The Third Circuit has stated that "where
>
> the movant bears the burden of proof at trial and the motion does
>
> not establish the absence of a genuine factual issue, the district
>
> court should deny summary judgment even if no opposing
>
> evidentiary matter is presented."

National State Bank, 979 F.2d at 1582 (citing Resolution Trust Corp. v. Gill, 960

F.2d 336, 340 (3rd Cir. 1992)).

Given the foregoing statement of the law, it is not surprising that a factual

dispute itself, as a matter of law, can be viewed as

> "genuine" only if the evidence is such [regarding the fact subject to
>
> dispute] that a reasonable jury[, with respect to such factual
>
> dispute,] could return a verdict for the nonmoving party.  Anderson
>
> v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, 106 S.Ct. 2505, 2510,
>
> 91 L.Ed.2d 202 ([U.S.] 1986); Equimark Comm. Finance Co. v.
>
> C.I.T. Financial Serv. Corp., 812 F.2d 141, 144 (3d Cir. 1987).  If
>
> evidence is "merely colorable" or "not significantly probative,"
>
> summary judgment may be granted.  Anderson, 477 U.S. at 249-
>
> 51, 106 S.Ct. at 2511; Equimark, 812 F.2d at 144.  Where the
>
> record, taken as a whole, could not "lead a rational trier of fact to

4

find for the nonmoving party, summary judgment is proper."

Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 106

S.Ct. 1348, 1356, 89 L.Ed.2d 538 ([U.S.] 1986).

Hankins v. Temple University, 829 F.2d 437, 440 (3rd Cir. 1987).

All of the foregoing notwithstanding, "at the summary judgment stage the

judge's function is not himself to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." Id., 477

U.S. at 249, 106 S.Ct. at 2511.  Therefore, any evidence that the movant

presents in an attempt to carry its initial summary judgment burden "must be

viewed in the light most favorable to the non-moving party." National State Bank,

979 F.2d at 1581 (citing O'Donnell v. United States, 891 F.2d 1079, 1081-82 (3rd

Cir. 1989)).  As well, "'the court must accept as true all reasonable inferences

that favor the nonmoving party.  However, ... [a court] may only consider

reasonable inferences; ... [it] may not improperly consider those inferences that

are unreasonable.'"  Elwell v. PP & L, Inc., 2002 WL 31160109 at 4 (3rd Cir.

2002) (quoting from the lower court's decision, which it affirmed) (emphasis in

original).

## STATEMENT OF FACTS

The parties do not really dispute any of the facts that are relevant to a

resolution of the instant matter.  However, the parties vigorously dispute (a) the

meaning of provisions – or, perhaps more accurately, one particular provision –

within the Letter Agreement, (b) the consequent impact of such provisions (or

provision) upon the Debtor's rights and Fikes' corresponding duties under the

5

MCA and the Letter Agreement, and (c) whether the foregoing issues have been conclusively resolved by virtue of an arbitration decision that was handed down on June 15, 2001 (i.e., whether such arbitration decision has collateral estoppel effect with respect to such issues in the instant matter). Accordingly, what follows in the ensuing paragraphs herein is a statement of facts relevant to a disposition of the instant matter, which facts, as just noted, are undisputed; so as to be complete, the Court appends to certain of such statements of fact the Court's rationale for why such facts are undisputed.

Pursuant to the MCA, the Debtor agreed to provide marketing consulting services to Fikes in return for compensation to be paid by Fikes. The MCA arose as part of a larger transaction, namely the sale by Taylor Milk Company (hereafter "Taylor Milk") of all of its assets to Fikes. Taylor Milk, in return for such sale of its assets, acquired a forty-five percent (45%) ownership interest in Fikes' outstanding common stock. Taylor Milk was majority-owned by Joseph Taylor, who also owned the Debtor. Taylor formed the Debtor for the purpose of providing to Fikes the marketing consulting services that comprise the subject of the MCA.

The MCA provided for a twenty-five (25) year term that would commence on July 1, 1997, and that would end on June 30, 2022. However, the MCA also provided, by its own terms, that it would terminate at such time as Taylor Milk ceased to own any of Fikes' common stock. On November 4, 2002, all of Taylor Milk's ownership interest in Fikes' common stock was sold by sheriff's execution sale to Protein Holdings, an entity not affiliated in any way with Taylor Milk; in

6

fact, Protein Holdings is the majority shareholder of Fikes.  Consequently, the

MCA terminated on November 4, 2002.

Because the MCA says nothing more on the issue of the Debtor's

compensation under such agreement other than that the Debtor and Fikes "shall

agree, from time to time, as to the compensation to be paid to" the Debtor, the

Debtor and Fikes entered into the Letter Agreement, which latter agreement

deals exclusively with the issue of such compensation.  The Letter Agreement

provides, in pertinent part, that:

Fike[s] shall compensate DCI [(i.e., the Debtor)] in accordance with

the following:

(a)     <u>Fee</u>.  As compensation for the management [(i.e.,

marketing consulting)] services provided pursuant to the ... [MCA],

each year during the term of the ... [MCA] Fike[s] shall pay to DCI

[(i.e., the Debtor)] a consulting fee (the "Consulting Fee") in the

amount of $500,000 per year.

(b)     <u>Draw and Payment</u>.  Each fiscal year (July 1 – June

30) during the term of ... [the MCA] Fike[s] shall pay to DCI [(i.e.,

the Debtor)] ..., as an advance against the Consulting Fee, a

monthly draw ("DCI's Draw").  Fike[s] shall pay each monthly DCI

Draw payment in advance on the first day of the month, with the

first DCI Draw payment due on July 1, 1997.

The amount of ... DCI's Draw ... shall be dependent upon the

maximum monthly amount of consulting fee distribution ("MMA")

7

approved by Fike[]s['] principal lender (currently Congress Financial

Corp.).  ...  At the end of each year a computation will be made

which determines whether the amounts paid to ... DCI [(i.e., the

Debtor)] have been equal to or less than the amount due to ... [DCI

(i.e., the Debtor)].  ...  If the amount paid to DCI [(i.e., the Debtor)] is

less than the amount due to it then an amount equal to such deficit

shall be posted to a "DCI Due To" account.  ...

...

(2)     [If Fikes' principal lender does not approve an MMA

for a given year, that is the MMA for a given year is set at $0.00,

then DCI (i.e., the Debtor) will not receive any draws for such year.]

...

...

Any portion of the Consulting Fee for a fiscal year which is

not paid in the form of the DCI Draw shall be due and payable

August 15 following the end of such fiscal year, *subject to the*

*approval of Fike[]s['] principal lender.*

Letter Agreement, dated May 28, 1997, at 1 – 2 (emphasis added).

Fikes does not dispute the assertion of the Trustee, and so the Court must

find that Fikes agrees, that the Debtor performed all of the services that were

contractually required of it under the MCA while such agreement remained

operative, that is the Debtor fully performed under the MCA for all relevant

periods.  Congress Financial Corporation (hereafter "Congress") was "Fike[]s[']

8

principal lender," as that term is used in the Letter Agreement, from the inception
of the MCA until at least November 4, 2002, which date is when the MCA
terminated.

The Trustee does not dispute the assertion of Fikes, and so the Court
must find that the Trustee agrees, that (a) Congress, as called for in the Letter
Agreement, approved the payment of the Debtor's fees for the period up until
November 1, 2000, (b) Congress so withheld approval of such fees for the period
beginning on November 1, 2000, and (c) Congress never approved the payment
of the Debtor's fees for any period subsequent to November 1, 2000.  More
formally, and so as to bring the foregoing facts into conformance with the scheme
that is set out in the Letter Agreement, Congress must have (a) essentially
withheld its approval of, and thereby forced the discontinuance of, monthly draw
payments to be made by Fikes to the Debtor relative to the annual $500,000 fee
beginning with the month of November 2000, (b) withheld its approval of the
payment of the difference between such $500,000 fee (for the period from July 1,
2000, to June 30, 2001) and the amount of any draws that the Debtor received
between July 1, 2000, and November 1, 2000, which balance would have
otherwise been payable on August 15, 2001, and (c) thereafter withheld, as well,
its approval of the payment of (i) such $500,000 fee for the period from July 1,
2001, to June 30, 2002 (which amount would have otherwise been payable on
August 15, 2002), and (ii) that portion of such $500,000 earned for the period
from July 1, 2002, to October 31, 2002 (which amount, presumably, would have
otherwise been payable on August 15, 2003).  The parties agree that Fikes did

9

not make any fee payments to the Debtor pursuant to the MCA and the Letter
Agreement for a period after November 1, 2000.

The Trustee also does not dispute Fikes' assertion, and so the Court must
find that the Trustee also agrees, that (a) Fikes, on February 29, 2004, sold all of
its assets to United Dairy, Inc., and thereupon ceased doing business, and (b)
Fikes nevertheless continues to exist at this time as a corporation in good
standing under the laws of the Commonwealth of Pennsylvania. Fikes orally
represented to the Court, and thus Fikes concedes, that (a) Congress, at least
after February 29, 2004, was no longer Fikes' principal lender, and (b) Fikes, at
least as of the present time, does not have an outside, that is an independent,
unaffiliated lender, let alone such a principal lender.

Pertinent consolidated financial statements of Fikes indicate (a) that, as of
June 30, 2001, Fikes had not paid to the Debtor $512,000 in fees that were
generated pursuant to the MCA, and (b) that, as of March 31, 2002, Fikes had
not paid to the Debtor $887,000 in fees that were generated pursuant to the
MCA. Fikes disputes neither the authenticity of such financial statements nor the
accuracy of the foregoing representations contained therein. Therefore, the
Court must find that Fikes does not dispute, that is the Court must find that Fikes
concedes, that such fees had not been paid by Fikes as of such dates. The
Court acknowledges Fikes' contention that such financial statements represent
that the creation of an obligation on Fikes' part for those fees generated for
periods subsequent to November 1, 2000, was subject to a condition precedent
(predicated on the approval by Congress of such obligation) that was never

10

satisfied.  The Court also understands Fikes to concede that it has thus far not

paid the aforesaid unpaid fees to the Debtor.

The Trustee seeks to recover as contract breach damages the $887,000

in unpaid fees as of March 31, 2002 (which amount includes, of course, the

$512,000 in unpaid fees as of June 30, 2001), plus unpaid fees for the period

from April 1, 2002, to October 31, 2002, or $291,666 (i.e., 7 months x

$500,000/12), for a total sum of $1,178,666.  The Trustee seeks to recover

unpaid fees up until October 31, 2002, because October 2002, as the parties

agree, constitutes the last full month prior to that in which occurred the

termination of the MCA.

Fikes contends that it is entitled to a $252,448.44 offset against any

amount that it might be found to owe to the Debtor pursuant to the MCA.  The

Trustee, at least for the purpose of her summary judgment motion, and in the

event that Fikes is thereby determined to owe an amount to the Debtor, agrees

that Fikes is entitled to an offset in such amount.  Accordingly, the Trustee, by

way of her summary judgment motion, seeks a recovery against Fikes in the net

amount of $926,217.56 (i.e., total damages under the MCA of $1,178,666 less an

offset of $252,448.44).  As well, the Trustee seeks interest on such net amount at

the rate of 6% from March 1, 2004; such date constitutes the first day after

February 29, 2004, which latter date, as set forth above, is (a) that upon which

Fikes ceased doing business, and (b) the latest date upon which Congress

ceased to be Fikes' principal lender.

Fikes initiated an arbitration claim against the Debtor with the American

11

Arbitration Association on November 21, 2000.  Fikes' arbitration claim

addressed whether Fikes could unilaterally reduce to $250,000 annually the

$500,000 annual fee that the Debtor, pursuant to the Letter Agreement, was to

receive as compensation under the MCA.  The Arbitrators, in their decision dated

June 15, 2001 (transmitted with a cover letter dated July 11, 2001), ruled that

Fikes could not unilaterally so reduce such annual fee (hereafter "the Arbitration

Decision").  In the course of so ruling, the Arbitrators held, in particular, that:

> It is found and determined that the written terms of the parties' MCA
>
> and ... Letter [Agreement] are not ambiguous and that the terms of
>
> the ... Letter [Agreement] control.  [Fikes] ... is obligated to pay to ...
>
> [the Debtor] each year during the remainder of the twenty-five year
>
> term of the MCA a Fee in the amount of $500,000.  Fee draws and
>
> payments shall be made in accordance with the terms set forth in
>
> the paragraphs under "(b) Draw and Payment" of the ... Letter
>
> [Agreement].

Arbitration Decision, dated June 15, 2001, at ¶ 2.  In response to Fikes'

arbitration claim, the Debtor filed an arbitration counterclaim, whereby the Debtor

sought a dollar amount award as a result of Fikes' alleged breach of the MCA

and the Letter Agreement.  The Arbitrators, in the Arbitration Decision, denied the

summary judgment request of Fikes vis-a-vis such counterclaim, and then noted

that the parties, at that time, declined to proceed with a hearing on such

counterclaim.  By virtue of an order dated September 14, 2001, the Pennsylvania

Court of Common Pleas, Allegheny County, confirmed the Arbitration Decision

12

and entered judgment thereon.

### DISCUSSION

Most of the parties' breach of contract controversy centers around the significance of the clause that comes at the end of a particular sentence that appears in the Letter Agreement, which sentence was quoted above and is also quoted below, to wit:

> Any portion of the Consulting Fee for a fiscal year which is not paid in the form of the DCI Draw shall be due and payable August 15 following the end of such fiscal year, *subject to the approval of Fike[]s['] principal lender*.

Letter Agreement, dated May 28, 1997, at 2 (emphasis added).  Such clause (i.e., the clause that has just been italicized by the Court) shall henceforth be referred to as "the Lender Approval Clause."

Fikes contends that the Lender Approval Clause states a condition precedent to the incurrence by Fikes of an obligation to pay the Debtor, for any given year while the MCA remained in effect, any part of the annual $500,000 fee that was otherwise called for in the Letter Agreement (hereafter the "Fee" or the "Fees");[3] Fikes contends that such condition precedent is the prior approval by

---

[3]More accurately, and so as to align Fikes' position with the scheme that is set out in the Letter Agreement, what Fikes argues – or, at least, what Fikes means to argue – is that the Lender Approval Clause states a condition precedent to the incurrence by Fikes of an obligation to pay the Debtor, for any given year while the MCA remained in effect, any part of the Fee that had not already been paid for such year by way of a draw to the Debtor.  Because the foregoing clarification appears to have minimal effect on the Court's resolution of the instant matter, and for the sake of convenience, the Court, except where

13

Fikes' principal lender of the accrual of such debt by Fikes. Put differently, Fikes

argues that the Lender Approval Clause, rather than merely describing an event

that needed to occur before Fikes would have to satisfy an existing, that is

accrued, liability to the Debtor for the Fee, instead states a condition precedent to

the very establishment, that is accrual, of such liability by Fikes to the Debtor.

Fikes thus contends, consistent with its construction of the Lender Approval

Clause, that it never owed to the Debtor, for any given year, that part of the Fee

for which Fikes' principal lender failed, in such given year, to authorize Fikes to

incur debt relative thereto. Extending Fikes' argument, Fikes takes the position

that, because, as set forth above, Congress, Fikes' principal lender, never

approved the payment of the Fee for any period subsequent to November 1,

2000, Fikes has never owed to the Debtor the Fee for any period subsequent to

such date, the Debtor's own full performance under the MCA notwithstanding;

put differently, Fikes contends that the condition precedent to the accrual of debt

on its part to the Debtor vis-a-vis the Fee for any period after November 1, 2000,

that is the approval by Congress of the incurrence of such debt by Fikes, was

never satisfied. Fikes contends further that, because, as it argues, such

condition precedent was never satisfied prior to November 4, 2002 (i.e., the date

when the MCA terminated), Fikes shall never incur, that is accrue, an obligation

to the Debtor for a Fee for any period subsequent to November 1, 2000.

---

otherwise expressly noted, *see, e.g.,* infra note 9 (and the text preceding such
footnote), shall henceforth state Fikes' position as it is stated in the text of the
instant opinion that immediately precedes and that immediately follows the
instant footnote.

14

The Trustee, as one would expect, disagrees with Fikes' construction of the Lender Approval Clause, and argues instead that the Lender Approval Clause, rather than stating a condition precedent like that which is argued for by Fikes, instead describes an event the occurrence of which simply marks the time when Fikes would have to satisfy what then constituted fixed, existing indebtedness on its part for Fees owed to the Debtor; the Trustee contends that such event is the approval by Fikes' principal lender of the satisfaction by Fikes of such existing debt.  Extending the Trustee's argument, the Trustee takes the position (a) that, because the Debtor fully performed under the MCA, and even though Congress never approved the payment of the Fee for any period subsequent to November 1, 2000, Fikes incurred fixed debt for Fees from such date up until November 4, 2002 (i.e., the date when the MCA terminated), and (b) that Fikes, by virtue of the Lender Approval Clause, could postpone, but could not thereby permanently avoid, its satisfaction of such debt (i.e., Fikes could so postpone but only while its principal lender deferred authorization relative to such satisfaction).

Fikes contends, in the alternative, that, even if, as the Trustee argues, the Lender Approval Clause does not state a condition precedent like that which is argued for by Fikes – and, thus, even if Fikes has incurred fixed debt for Fees owed for the period from November 1, 2000, to November 4, 2002 – Fikes nevertheless has thus far not breached the Letter Agreement (and thus the MCA) by refusing to satisfy such debt.  Fikes initially so argues (a) because, it argues in turn, even the Trustee agrees that such satisfaction was, and is, not contractually

15

required prior to the date when Fikes' principal lender authorized, or would authorize, such satisfaction, and (b) since, as Fikes points out, it is undisputed that no principal lender of Fikes has ever, even to the present time, provided such authorization.

The Trustee responds to such alternative position of Fikes by arguing (a) that, although the Lender Approval Clause enables Fikes to postpone the satisfaction of the debt in question (i.e., Fikes' fixed debt for Fees owed for the period from November 1, 2000, to November 4, 2002) until Fikes' principal lender provides authorization for such satisfaction, such postponement may last for only so long as Fikes has a principal lender, and (b) that Fikes ceased to have a principal lender at least as of February 29, 2004, which date is when Fikes sold all of its assets to United Dairy, Inc., and thereupon ceased doing business.

The Court understands Fikes to (a) disagree with the Trustee that the Lender Approval Clause becomes inoperative on the date when Fikes would cease to have a principal lender, (b) argue instead that such clause remains operative indefinitely if Fikes ceases to, and during the period while Fikes does not, have a principal lender, and (c) even argue that, if it were to permanently cease to have a principal lender prior to such lender ever having authorized the satisfaction of the debt in question, then Fikes, in accordance with such clause, would henceforth be relieved permanently from having to satisfy such debt. However, and as yet another alternative argument, Fikes contends that, even if it was required to satisfy the debt in question as of the date when it ceased to have a principal lender, Fikes has had a principal lender since February 29, 2004

16

(which date, as set forth above, is the latest date when Congress would have constituted Fikes' principal lender).  Such principal lender, argues Fikes, is Protein Holdings, which entity was, and is, the majority shareholder of Fikes, who, in turn, has continued to exist as a corporation in good standing under the laws of the Commonwealth of Pennsylvania notwithstanding that it ceased to be operational after February 29, 2004.

The Trustee takes issue, as well, with this last alternative argument by Fikes, arguing in response that it matters not if Protein Holdings has actually constituted such a principal lender subsequent to February 29, 2004.  The Trustee argues as much because the Trustee argues, in turn, that (a) "Fike[]s['] principal lender," as that term is used in the Lender Approval Clause, means an outside lender, that is a lender who is independent of, and thus unaffiliated with, Fikes, and (b) Protein Holdings, far from being such an independent lender to Fikes (if it has even lent to Fikes), is Fikes' majority shareholder.  Fikes, the Court is certain, disagrees that the language "Fike[]s['] principal lender" must be read in the fashion that is advanced by the Trustee.

The parties also disagree as to the effect that the Arbitration Decision might have on the outcome of the parties' dispute regarding whether Fikes owes, and/or when Fikes must pay, Fees for any period subsequent to November 1, 2000.  The Trustee contends that (a) the Arbitrators ruled, in the Arbitration Decision, that Fikes was unconditionally obligated to pay the Fee for every period while the MCA remained operative, and (b) such decision must be accorded collateral estoppel effect in the instant matter.  Fikes disagrees that the

17

Arbitrators ruled that the Lender Approval Clause does not state a condition precedent like that which is argued for by Fikes; in fact, Fikes argues that the Arbitrators arguably recognized that the Lender Approval Clause does state such a condition precedent.  However, with respect to collateral estoppel regarding the condition precedent issue, Fikes contends, in any event, that the Arbitration Decision does not operate to collaterally estop Fikes from litigating such issue at the present time.  Fikes so argues (a) because, argues Fikes, the only arbitration claim that was decided by the Arbitrators in their Arbitration Decision was that of Fikes, to wit whether Fikes could unilaterally reduce the Fee from $500,000 annually to $250,000 annually, (b) since, contends Fikes, whether the Lender Approval Clause does or does not state a condition precedent had no bearing on the Arbitrators' ruling that Fikes could not so reduce the Fee, and (c) because, argues Fikes, the Arbitrators thus never even actually ruled regarding the existence of such a condition precedent.  Both parties appear to contend that the Arbitration Decision operates to collaterally estop the other from arguing that the Lender Approval Clause is ambiguous.

The Court understands Fikes to also defend the Trustee's summary judgment motion by arguing, in the alternative, that, if the Court ultimately reaches the point of having itself to interpret the Lender Approval Clause (which would be the case if the Court finds that the Arbitration Decision lacks collateral estoppel effect with respect to the condition precedent issue), and if the Court then determines that such clause is ambiguous (which determination could occur if the Court were to conclude, contrary to what the parties contend, that the

18

Arbitration Decision does not operate to collaterally estop either party from arguing that such clause is ambiguous), then Fikes would at least be entitled to a trial so as to clear up such ambiguity (that is, that the Court is not free to grant summary judgment if such an ambiguity is found to exist).

Fikes contends, as well, that the Trustee concedes that (a) Fikes does not continue to owe Fees to the Debtor for a period prior to November 1, 2000, and (b) the only Fees that are in play for the instant matter pertain to the period subsequent to November 1, 2000. Such contention by Fikes, however, must be rejected by the Court because the Trustee contrarily contends – in fact explicitly – that Fikes continues to owe Fees to the Debtor for a period prior to November 1, 2000. Because the Trustee so contends, the Court presumes that Fikes contends, in response, that it no longer owes any Fees for a period prior to November 1, 2000. Therefore, the Court finds that the parties dispute whether Fikes continues to owe Fees to the Debtor for a period prior to November 1, 2000.

Fikes also argues, as a threshold matter, that it is entitled to summary judgment in its favor because the Trustee failed to respond to a Statement of Material Facts that Fikes provided in support of its cross-motion for summary judgment.

I.      **The Trustee's Failure to Respond to Fikes' Statement of Material Facts.**

Fikes filed a 91-paragraph Counter-Statement of Material Facts in support

19

of its cross-motion for summary judgment (hereafter "the Statement of Material

Facts").  The Trustee failed to respond at all to the Statement of Material Facts.

Fikes contends that, because the Trustee failed to so respond, all of the facts

contained in the Statement of Material Facts are, for the purpose of Fikes'

summary judgment cross-motion, deemed admitted by the Trustee.  Fikes so

contends (a) because, argues Fikes, the Local Rules of the United States District

Court for the Western District Court of Pennsylvania (hereafter "the Local District

Court Rule(s)") – and, in particular, Local District Court Rule 56.1 – apply in this

Court and, in particular, to the instant adversary proceeding, and (b) since Local

District Court Rule 56.1 provides, in pertinent part, that "[a]lleged material facts

set forth in the moving party's Concise Statement of Material Facts ..., will for the

purpose of deciding the motion for summary judgment be deemed admitted

unless specifically denied or otherwise controverted by a separate concise

statement of the opposing party."  W.D.PA.LR 56.1(E) (West 2005).[4]

Among the statements of fact contained within the Statement of Material

Facts are the following:

(a)     "Under the Letter Agreement, Fikes' obligations to pay the Monthly Draw

        Payments were conditioned on Fikes obtaining the approval of its principal

        lender, at all relevant times, Congress Financial Corporation."  [The

_____

[4]If Fikes is correct that Local District Court Rule 56.1 applies to the instant
adversary proceeding, then, pursuant to such rule, the Trustee needed to
respond to the Statement of Material Facts within 30 days after Fikes served
such statement (along with Fikes' summary judgment cross-motion) on the
Trustee.  *See* W.D.PA.LR 56.1(C) (West 2005).

20

Statement of Material Facts, ¶ 17]

(b)    "Similarly, Fikes' obligation to pay the Balance Payments was also subject

to the condition that Congress Financial approve payment of the same."

[The Statement of Material Facts, ¶ 19]

(c)    "Fikes made all of the payments required by the DCI Consulting

Agreement [(i.e., the MCA)]."  [The Statement of Material Facts, ¶ 24]

*See* Fikes' Counter-Statement of Material Facts (Docket No. 34), at pp. 3-4.

Therefore, Fikes contends that the Trustee, for the purpose of Fikes' summary

judgment cross-motion, admits that (a) the Lender Approval Clause states a

condition precedent to the incurrence by Fikes of an obligation to pay the Debtor,

for any given year while the MCA remained in effect, any part of the Fee, (b)

such condition precedent took the form of Congress' prior approval of the

incurrence of such debt by Fikes, and (c) Fikes made all of the payments

required by the MCA.

Because of such alleged admissions by the Trustee, and since, as set

forth above, Congress never approved the payment of Fees at anytime

subsequent to November 1, 2000, Fikes contends that, without more, it is (a)

entitled to a summary judgment ruling to the effect that it has never owed, and

will never owe, to the Debtor Fees for any period subsequent to November 1,

2000, (b) entitled to a summary judgment ruling to the effect that it does not

presently owe to the Debtor any part of the Fee for a period prior to November 1,

2000, and (c) thus entitled to a grant of its summary judgment cross-motion

regarding the Trustee's Count 1.

21

The Court must reject this particular position of Fikes for several reasons.

First, contrary to what Fikes argues, the Local District Court Rules – and, in

particular, Local District Court Rule 56.1 – do not apply either generally in this

Court or, in particular, to the instant adversary proceeding.  The Court so rules

because (a) local district court rules, as a general matter, do not apply to

proceedings in bankruptcy, *see* In re Flanagan, 999 F.2d 753, 758 n.7 (3rd Cir.

1993); In re Kaliana, 207 B.R. 597, 603 (Bankr.N.D.Ill. 1997) ("While it is true that

the bankruptcy judges in the District constitute a unit of the District Court

pursuant to 28 U.S.C. § 151, the Local General Rules of the District Court are not

identical to and are separate from the Local Bankruptcy Rules, promulgated

under Federal Rule of Bankruptcy Procedure 9029"), (b) local district court rules,

if they do apply to bankruptcy proceedings, only so apply if local bankruptcy rules

adopt or incorporate, either in part or in full, such local district court rules, *see* In

re Woodard, 2003 WL 21145736 at 1 (N.D.Tex. 2003); In re Zuniga, 332 B.R.

760, 774 (Bankr.S.D.Tex. 2005), (c) this Court's local rules (i.e., the Local Rules

of the United States Bankruptcy Court for the Western District Court of

Pennsylvania) do not adopt or incorporate, in full, the Local District Court Rules,

and (d) this Court's local rules do not adopt or incorporate, in particular, Local

District Court Rule 56.1.

Second, even if the Local District Court Rules apply – or, at least, Local

District Court Rule 56.1 applies – generally in this Court and, in particular, to the

instant adversary proceeding, an application of Local District Court Rule 56.1 to

the Trustee's failure to respond to the Statement of Material Facts does not result

22

in the three deemed factual admissions, as set forth above, that are argued for

by Fikes.[5]  The Court so rules because (a) facts that may be the subject of a

deemed admission pursuant to Local District Court Rule 56.1 are only "'historical

facts, not mixed-law[/]fact assertions and not evaluative determinations,'" <u>Chao v.</u>

<u>Rizzi</u>, 2007 WL 2317335 at 1 n.2 & 3 n.8 (W.D.Pa. 2007) (adopting an

interpretation of Local District Court Rule 56.1 identical to that accorded to a

similar local rule that exists in another federal district; Local District Court Rule

56.1 applied to this matter because, even though it was commenced in the

bankruptcy court, it was subsequently withdrawn to, and then decided by, the

district court), and (b) the three aforesaid facts that Fikes seeks to have deemed

admitted in the instant matter, instead of constituting historical facts, constitute

mixed law/fact assertions or evaluative determinations.  That these facts that

Fikes seeks to have so deemed admitted constitute mixed law/fact assertions

follows because (a) whether Congress' prior approval of the incurrence of debt

by Fikes to the Debtor with respect to Fees constitutes a condition precedent to

the incurrence by Fikes of such debt is a mixed question of law and fact, and (b)

whether Fikes made all of the payments required by the MCA likewise constitutes

a mixed question of law and fact.

　　　Therefore, that the Trustee failed to respond to the Statement of Material

---

[5]The Court sees no reason to even discuss the potential impact or
propriety of having deemed admitted those factual assertions contained in the
Statement of Material Facts other than the three that were set forth earlier herein
because, even if such other facts were deemed admitted, they would, in the
Court's view, do little to assist Fikes in prevailing on its summary judgment cross-
motion.

Facts neither results in any, let alone – from Fikes' point of view – any useful, deemed factual admissions by the Trustee nor, consequently, compels the entry of summary judgment in Fikes' favor with respect to the Trustee's Count 1.

**II.    Whether Fikes continues to owe Fees to the Debtor for a period prior to November 1, 2000?**

As set forth above, the parties dispute whether Fikes continues to owe Fees to the Debtor for a period prior to November 1, 2000.  The Court finds that such dispute constitutes a dispute as to an ultimate question of fact, that is a dispute as to a mixed question of fact and law, which dispute requires for its resolution a legal conclusion to be drawn from facts that are already established. "[W]hen the only question is what legal conclusions are to be drawn from an established set of facts, the entry of a summary judgment usually should be directed," 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2725 (3rd ed. 2008) (quoted in In re Foxmeyer Corp., 286 B.R. 546, 556 (Bankr.D.Del. 2002)); "[t]herefore, genuine disputes as to ultimate questions of fact are normally treated, for purposes of a summary judgment motion under Rule 56, as are other genuine legal disputes, which is to say that the existence of such disputes shall not preclude the entry of a summary judgment," Foxmeyer Corp., 286 B.R. at 556.  Accordingly, the Court can resolve at the summary judgment stage the issue of whether Fikes continues to owe Fees to the Debtor for a period prior to November 1, 2000, provided that the underlying facts necessary to such resolution are not subject to genuine dispute.

Although the parties dispute whether Fikes continues to owe Fees to the

Debtor for a period prior to November 1, 2000, it is important to understand that

the parties do not dispute the following:

(a)     that the Debtor performed all of the services that were contractually

         required of it under the MCA (i) while such agreement was operative, and

         (ii) for periods prior to November 1, 2000;

(b)     that Fikes' principal lender (i.e., Congress), as called for in the Letter

         Agreement, approved the payment of Fees for the period up until

         November 1, 2000 – significantly, even though Fikes argues that the

         creation of an obligation on Fikes' part regarding the Fee is conditioned on

         the approval by Congress of such obligation, Fikes itself concedes that

         such approval was obtained with respect to Fees for the period up until

         November 1, 2000; and

(c)     that Fikes has never paid to the Debtor the $512,000 worth of Fees that,

         as of June 30, 2001, Fikes had not yet paid to the Debtor.

         That the parties do not dispute that Fikes has never paid to the Debtor the

$512,000 worth of Fees that, as of June 30, 2001, Fikes had not yet paid to the

Debtor is significant when one realizes that such $512,000 in Fees must

necessarily pertain, in part, to the Fee for the period from late June 2000 to

October 31, 2000 (i.e., a period prior to November 1, 2000, as well as, in part, to

the period post-November 1, 2000).  Such $512,000 in Fees must necessarily

pertain, in part, to the Fee for the period from late June 2000 to October 31,

2000, because (a) the Debtor, according to the Letter Agreement, was only to

earn $500,000 for each fiscal year ending June 30, (b) $500,000 of such

25

$512,000 must consequently represent the Fee for the period from July 1, 2000,

to June 30, 2001, and (c) the remaining $12,000 must consequently represent

the Fee for the latter part of the month of June 2000 (i.e., $12,000 <

$500,000/12).  Therefore, a genuine dispute does not exist that Fikes has not yet

paid to the Debtor Fees for a period prior to November 1, 2000, namely the Fee

for the period from late June 2000 to October 31, 2000.

Does Fikes presently owe to the Debtor the Fee for the period from late

June 2000 to October 31, 2000?  The answer must be "yes" because, as set

forth above, the parties do not dispute that (a) the Debtor has earned such Fee,

and (b) Fikes' principal lender (i.e., Congress) approved the payment of Fees for

the period up until November 1, 2000.  Therefore, the Trustee is entitled to a

summary judgment in her favor to the effect that Fikes continues to owe Fees to

the Debtor for a period prior to November 1, 2000, namely for the period from

late June 2000 to October 31, 2000.

The Court concludes that it can also hold, at the summary judgment stage,

that $178,667 of the aforesaid unpaid $512,000 in Fees pertains to the period

from late June 2000 to October 31, 2000.  The Court so holds because (a) the

Fee for the period from July 1, 2000 – October 31, 2000 must equal $166,667

(i.e., $500,000 annual Fee/12 x 4 months, or $166,667), (b) the Fee for the latter

part of June 2000 must, as set forth above, equal $12,000, and (c) $166,667 plus

$12,000 equals $178,667.  Therefore, the Court must hold that (a) Fikes, as a

matter of law, is in breach of the MCA and the Letter Agreement for not having

yet paid to the Debtor, pursuant to such agreements, $178,667, and (b) the

26

Trustee is thus entitled to summary judgment in her favor in at least the amount of $178,667 (plus interest, barring any applicable setoff in favor of Fikes).

**III.    Whether the Arbitration Decision has collateral estoppel effect in the instant matter?**

As set forth above, the parties disagree as to whether the Arbitration Decision has collateral estoppel effect in the instant matter with respect to the condition precedent issue.  However, both parties appear to contend that the Arbitration Decision operates to collaterally estop the other from arguing that the Lender Approval Clause is ambiguous.

Because Pennsylvania law and federal law are essentially the same regarding the elements that must be shown for collateral estoppel effect to be accorded to the Arbitration Decision in the instant matter, *see* In re Cowden, 337 B.R. 512, 529-530 (Bankr.W.D.Pa. 2006), the Court need not determine which set of principles relative to collateral estoppel – i.e., federal or state – that it should apply in the instant matter.

[T]he following elements[, under either federal or Pennsylvania law,] ... [must] be present in order for collateral estoppel to apply:

(1)    The issue sought to be precluded is the same as that decided in the prior action;

(2)    That issue was actually litigated in the prior action;

(3)    The resolution of that issue was determined by a valid and final judgment on the merits;

(4)    The resolution of such issue must have been essential to the

27

prior judgment;

(5)    The party against whom the bar of collateral estoppel is

asserted was a party or in privity with a party to the prior

adjudication; and

(6)    The party against whom such bar is asserted had a full and

fair opportunity to litigate the issue in question in the prior

action.

Id. at 530.

Applying the foregoing to the Arbitration Decision vis-a-vis the issue of

whether the Lender Approval Clause states a condition precedent like that which

is argued for by Fikes, the Court holds, at a minimum, that the fourth collateral

estoppel element stated above, that is that the resolution of the issue sought to

be precluded must have been essential to the prior judgment, is not satisfied.

The Court so holds because (a) the only arbitration claim that was decided by the

Arbitrators in their Arbitration Decision was that of Fikes, to wit whether Fikes

could unilaterally reduce the Fee from $500,000 annually to $250,000 annually,

and (b) whether the Lender Approval Clause states a condition precedent was

not essential to, indeed the resolution of such issue had no bearing whatsoever

on, the Arbitrators' ruling that Fikes could not so reduce the Fee.  Therefore, the

Arbitration Decision does not have collateral estoppel effect in the instant matter

with respect to, and thus the Court must itself resolve, the issue of whether the

Lender Approval Clause states a condition precedent.

Because the Court resolves, in the fashion that it does, the issue of

28

whether the Arbitration Decision has collateral estoppel effect with respect to the issue, in turn, of whether the Lender Approval Clause states a condition precedent, the Court need not address whether the Arbitrators (a) construed the Lender Approval Clause such that it states a condition precedent, (b) actually construed such clause at all, or (c) ruled at all with respect to such clause. However, the Court notes that (a) both parties seize on the language in the Arbitration Decision to the effect that the written terms of the MCA and the Letter Agreement are not ambiguous, *see* Arbitration Decision, dated June 15, 2001, at ¶ 2, (b) each party contends, on the strength of such language, that the Arbitrators thereby ruled that the Lender Approval Clause, which clause appears in the Letter Agreement, is unambiguous, and (c) each party then contends that the other is consequently collaterally estopped in the instant matter from arguing that the Lender Approval Clause is ambiguous.  Of course, whether the Lender Approval Clause is ambiguous becomes relevant now that the Court must itself ascertain whether such clause states a condition precedent.  Therefore, the Court must determine whether the Arbitration Decision collaterally estops the parties from arguing that the Lender Approval Clause is ambiguous.  The Court concludes, in very short order, that the Arbitration Decision does not so collaterally estop the parties.  The Court so concludes because whether the Lender Approval Clause is ambiguous, much like whether the Lender Approval Clause states a condition precedent, was not essential to, indeed the resolution of such issue had no bearing whatsoever on, the Arbitrators' ruling that Fikes

29

could not reduce the Fee from $500,000 annually to $250,000 annually.[6]

Therefore, the Arbitration Decision does not have collateral estoppel effect with respect to any of the issues raised in the instant matter relative to the construction of the Lender Approval Clause.[7]  Consequently, the Court must itself interpret and resolve all issues that arise herein regarding the Lender Approval Clause.

## IV.    Whether the Lender Approval Clause states a condition precedent?

The parties, as set forth above, vigorously disagree as to whether the

---

[6]The Court notes, as an aside, that, even if it were to rule that the Arbitration Decision has collateral estoppel effect regarding the issue of whether the Lender Approval Clause is ambiguous so that, in turn, neither of the parties could henceforth argue that such clause is ambiguous, such collateral estoppel ruling would not change the outcome of the instant matter.  The Court so holds because the Court, in turn and independent of the Arbitration Decision, holds below that (a) the Lender Approval Clause unambiguously does not state a condition precedent like that which is argued for by Fikes, see infra note 10 (and the text preceding such footnote), (b) such clause instead unambiguously does nothing other than to describe an event the occurrence of which marks the time when Fikes would have to satisfy what then constituted fixed, existing indebtedness on its part to the Debtor with respect to Fees, see infra note 10 (and the text preceding such footnote), (c) such clause unambiguously becomes inoperative if, and when, Fikes would cease to have a principal lender, see infra note 15 (and the text preceding such footnote), and (d) the language "Fikes' principal lender" unambiguously can only refer to an outside lender, that is a lender who is independent of, and thus unaffiliated with, Fikes, see infra note 16 (and the text preceding such footnote).

[7]Since, as set forth above, collateral estoppel is not applicable in the instant matter, the Court also need not formally address whether collateral estoppel can be applied to an arbitration decision.  As an aside, however, if Pennsylvania law regarding collateral estoppel applies, then "arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel."  Witkowski v. Welch, 173 F.3d 192, 199-200 (3rd Cir. 1999) (applying Pennsylvania law); see also 28 P.L.E.2d Judgment § 254 at 328-329 (Bender 2003) (same).

30

Lender Approval Clause states a condition precedent.  Fikes contends, on the

one hand, that such clause operates to condition Fikes' incurrence (i.e., accrual)

of indebtedness to the Debtor with respect to Fees upon the prior approval by

Fikes' principal lender of the very incurrence of such debt.  The Trustee, on the

other hand, maintains that such clause, rather than stating such a condition

precedent, instead merely describes an event the occurrence of which marks the

time when Fikes would have to satisfy what then constituted fixed, existing

indebtedness on its part to the Debtor with respect to Fees; such event, argues

the Trustee, is the approval by Fikes' principal lender of the satisfaction by Fikes

of such existing debt.

  "The construction, interpretation, and legal effect[] of a written instrument

is for the court when such instrument is unambiguous," that is the construction

and interpretation of an unambiguous contract is a question of law.  12 P.L.E.2d

*Contracts* § 174 at 243-244 (Bender 2001); *see also* Hewes v. McWilliams, 194

A2d 339, 342 (Pa. 1963) (same); Sirianni v. General Motors Corp., 313 F.Supp.

1176, 1178 (W.D.Pa. 1970) (same).  "The court, as a matter of law, [also]

determines the existence of an ambiguity."  Hutchison v. Sunbeam Coal Corp.,

519 A.2d 385, 390 (Pa. 1986); Thomas Rigging & Construction Co., Inc. v.

Contraves, Inc., 798 A.2d 753, 756 (Pa.Super.Ct. 2002); 12 P.L.E.2d *Contracts*

§ 174 at 23 (Bender Supp. 2007); *see also* 12 P.L.E.2d *Contracts* § 146 at 198

("Whether contract provisions are clear or ambiguous is a question of law").

Because "legal determinations are appropriate for resolution without trial, that is

by way of a summary judgment motion," In re Kostelnik, 362 B.R. 215, 218

31

(Bankr.W.D.Pa. 2007), and since the construction and interpretation of unambiguous contract language and the determination of whether, in the first instance, contract language is ambiguous are legal determinations, such legal determinations may be resolved via a summary judgment motion.  *See* Id.; In re Air Nail Company, Inc., 329 B.R. 512, 528 (Bankr.W.D.Pa. 2005).

"A contractual term is clear[, that is unambiguous,] if it is capable of only one reasonable or fair interpretation without reference to matters outside the contract."  Haymond v. Lundy, 177 F.Supp.2d 371, 378 (E.D.Pa. 2001).  "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense."  Hutchison, 519 A.2d at 390; Thomas Rigging, 798 A.2d at 756; *see also* Perry v. Sonic Graphic Systems, Inc., 94 F.Supp.2d 616, 619-620 (E.D.Pa. 2000) ("when a party argues that a contract contains an ambiguity, that party must be able to point to a reasonable alternative interpretation for the ambiguity," and "[t]he Court is not required to entertain unreasonable interpretations of potentially ambiguous contract terms").  "In determining whether there is an ambiguity ..., the whole contract, rather than an isolated part, must be considered, and the ordinary meaning of the words of the contract cannot be distorted to establish ambiguity."  12 P.L.E.2d *Contracts* § 146 at 196-197.  "[A] contract provision will not be considered ambiguous simply because the parties do not agree upon the proper construction."  Espenshade v. Espenshade, 729 A.2d 1239, 1242 (Pa.Super.Ct. 1999); *see also* Haymond, 177 F.Supp.2d at 378 (same); 12 P.L.E.2d *Contracts* § 146 at 196 (same).

32

With respect to conditions precedent in particular, "[t]he rule in Pennsylvania is that a condition precedent to [the creation of] an obligation must be expressed by clear language or it will be construed as a promise or covenant," Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1016 (3rd Cir. 1980); 12 P.L.E.2d *Contracts* § 417 at 402; i.e., the language in question will *not* be construed as a condition precedent to the creation of an obligation if such language is in any way ambiguous in such regard,[8] *see* Mellon Bank, 619 F.2d at 1016; 12 P.L.E.2d *Contracts* § 417 at 402; *see also* Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Board, 739 A.2d 133, 139 (Pa. 1999) ("an act or event designated in a contract will not be construed as a condition unless that clearly appears to be the intention of the parties"); Beaver Dam Outdoors Club v. Hazleton City Authority, ___ A.2d ___, 2008 WL 442496 at 3 & 6 (Pa.Commw.Ct. 2008) (same); Estate of Barilla, 535 A.2d 125, 129 (Pa.Super.Ct. 1987) (same); *accord* Air Nail Company, 329 B.R. at 529 (citing numerous cases to the effect that "[i]n California, 'it is the general rule in contract interpretation that stipulations in an agreement are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language'"). "Consequently, if an ambiguity exists as to whether a contractual obligation constitutes a condition precedent, such obligation, as a matter of law in

---

[8]For the sake of convenience, the Court will henceforth refer to "a condition precedent to the creation of an obligation" as just "a condition" or just "a condition precedent." Therefore, when the Court utilizes the term "condition" in the instant opinion, what it means to refer to is "a condition precedent to the creation of an obligation" unless clearly noted otherwise.

... [Pennsylvania], must be construed as but a mere covenant and not a condition

precedent." <u>Air Nail Company</u>, 329 B.R. at 529.  Because – applying the

foregoing law regarding legal determinations and summary judgment –

determinations as to whether unambiguous contract language states a condition

precedent, or whether contract language is ambiguous as to whether it states a

condition precedent, are legal determinations that may be resolved via summary

judgment, and since such determinations will also necessarily be made without

resort to parol evidence, "whether a contractual obligation constitutes a condition

precedent or merely a covenant ... is particularly appropriate for resolution via a

summary judgment motion."  <u>Id.</u>

　　　　Applying all of the foregoing law to the instant matter, the Court holds, as

a matter of law, that Fikes can prevail with respect to its condition precedent

position only if the Lender Approval Clause unambiguously states a condition

precedent like that which is argued for by Fikes.  The Court so holds because, if

the Lender Approval Clause (a) unambiguously provides for the opposite, that is

such clause unambiguously does not state such a condition precedent, then

Fikes' condition precedent position, of course, necessarily fails, and (b) is

ambiguous as to whether it states such a condition precedent, then Fikes, by

virtue of the very existence of such ambiguity, necessarily also loses with respect

to its condition precedent position.  The Court also holds that, because Fikes'

condition precedent position necessarily fails if the Lender Approval Clause is

ambiguous as to whether it states a condition precedent like that which is argued

for by Fikes, Fikes, as a matter of law, is not entitled to a trial if, and solely on the

34

basis that, such ambiguity is found to exist.

Having so held, the Court next proceeds to hold that the Lender Approval
Clause does not unambiguously state a condition precedent like that which is
argued for by Fikes.  The Court so holds because it holds, in turn, that (a) the
Lender Approval Clause is unambiguous but only in the sense that it does not
state a condition precedent like that which is argued for by Fikes, and (b) such
clause, in any event, is at least reasonably susceptible to being construed such
that it does not state such a condition precedent, that is, under a best case
scenario for Fikes, such clause is no better than ambiguous as to whether it
states such a condition precedent, which ambiguity, of course, is fatal to Fikes'
cause.

The Court bases its decision that the Lender Approval Clause
unambiguously does not state a condition precedent like that which is argued for
by Fikes – that is, that such clause unambiguously does not operate to condition
Fikes' incurrence (i.e., accrual) of indebtedness to the Debtor with respect to
Fees upon the prior approval by Fikes' principal lender of the very incurrence of
such debt – upon the following:

(a)     The fact that the Letter Agreement, in section (a) thereof, unqualifiedly
        imposes upon Fikes an annual obligation with respect to the Fee for so
        long as the MCA remains operative – the absence of a qualification in
        such language strongly implies that the accrual of indebtedness on Fikes'
        part with respect to the Fee is unconditional;

(b)     The fact that the Lender Approval Clause is placed in section (b) of the

35

Letter Agreement (or, at least, below such section (b)) rather than in section (a) thereof (i.e., that section of such agreement wherein, as just set forth, Fikes' obligation relative to the Fee is established) – if the Lender Approval Clause were to state a condition precedent to the accrual of indebtedness on Fikes' part relative to the Fee, then the Court would expect that such clause would have also been placed in section (a) thereof;

(c)     The fact that no reference is made in section (a) of the Letter Agreement to section (b) thereof – at a bare minimum, the Court would expect that, if the accrual of indebtedness on Fikes' part with respect to the Fee were to be conditioned as Fikes argues but such condition were not to appear in section (a) of the Letter Agreement, then such section (a), when establishing Fikes' obligation relative to the Fee, would at least have referenced such supposed condition in section (b) thereof, yet no such reference is to be found;

(d)     The fact that section (b) of the Letter Agreement, wherein the Lender Approval Clause appears, deals exclusively with the manner in which Fikes will satisfy its obligation with respect to the Fee (i.e., draws and payments with respect to the Fee) – the Court finds it to be highly improbable that, if, as Fikes argues, the Lender Approval Clause states a condition precedent to the very incurrence of debt relative to the Fee, such clause would appear in that section of the Letter Agreement that deals exclusively with the satisfaction of such debt (especially given that, if such

36

clause states such a condition precedent, such clause could have very

easily instead have been inserted into section (a) of such agreement); and

(e)     The fact that language appears in the second paragraph of section (b) of

the Letter Agreement (or, alternatively, in the paragraph that follows such

section (b) if such section is but one paragraph in length) to the effect that

an annual computation will be made, at the end of each of Fikes' fiscal

years, which determines whether amounts that have been paid to the

Debtor (via draws throughout such year) are equal to or less than "the

amount due to" the Debtor with respect to the Fee, and that if the amount

of such payments to the Debtor is less than "the amount due to it[,] then

an amount equal to such deficit shall be posted to a 'DCI [(i.e., Debtor)]

Due To' account" – such "due to" language (i) strongly implies that Fikes

unconditionally incurs a debt to the Debtor by, at the latest, the close of

each of Fikes' fiscal years with respect to that part of the annual Fee that

has not been paid to the Debtor throughout such fiscal year in the form of

a draw, and (ii) thereby operates to impair Fikes' contrary position, that is

Fikes' position that, pursuant to the Lender Approval Clause, a debt is not

incurred for the portion of the Fee not paid via a draw until, at the earliest,

the date when Fikes' principal lender approves the incurrence of such

debt.[9]

---

[9]The Court reminds the reader that what Fikes actually argues – or, at
least, what Fikes means to argue – is that the Lender Approval Clause states a
condition precedent to the incurrence by Fikes of an obligation to pay the Debtor,
for any given year while the MCA remained in effect, any part of the Fee that had

Because the Court holds that the Lender Approval Clause unambiguously does not state a condition precedent like that which is argued for by Fikes, the Court holds, as well, that such clause instead unambiguously does nothing other than to describe an event the occurrence of which marks the time when Fikes would have to satisfy what then constituted fixed, existing indebtedness on its part to the Debtor with respect to the Fee.[10]

As for the Court's decision that the Lender Approval Clause, in any event, is at least reasonably susceptible to being construed such that it does not state a condition precedent like that which is argued for by Fikes, the Court so holds because, quite simply, no language appears anywhere in either the Letter Agreement or the MCA that serves to dispel such susceptibility.

The Court's decision as just set forth is not affected – although Fikes contends that it should be – by the presence of the "due and payable" language in the same sentence of the Letter Agreement wherein appears the Lender Approval Clause. More specifically, Fikes latches onto such "due and payable" language and (a) argues, based upon such language, that the Fee for any given

---

not already been paid for such year by way of a draw to the Debtor (such condition precedent being the prior approval by Fikes' principal lender of the accrual of such debt by Fikes). *See* supra note 3.

[10]Because the Court holds, as just set forth and independent of the Arbitration Decision, that the Lender Approval Clause is unambiguous vis-a-vis the issue of whether it states a condition precedent like that which is argued for by Fikes, it does not even matter whether the Arbitration Decision would operate to collaterally estop the parties from arguing that the Lender Approval Clause is ambiguous regarding such issue. *See* supra note 6 for a further discussion of why it does not matter whether the Arbitration Decision would have such collateral estoppel effect.

year (or, more accurately, that part of the Fee for any given year that had not yet

been satisfied by way of a draw to the Debtor) did not become due until the same

time that it became payable, that is when Fikes' principal lender approved the

payment of such Fee, and (b) contends consequently that such language, when

coupled with the Lender Approval Clause, compels the result that Fikes'

incurrence of debt relative to the Fee is conditioned upon the approval of Fikes'

principal lender.  To support its interpretation of such "due and payable"

language, Fikes relies on the decision in Transport Properties, Inc. v. ABC

Treadco, Inc., 589 F.Supp. 445 (S.D.N.Y. 1984), which decision, in turn, relied on

the decision in Berman v. Hall, 340 A.2d 251 (Md. 1975); the Transport

Properties court relied on Berman because it applied Maryland law as part of its

decision.  The Transport Properties and Berman courts held, when construing

broker compensation agreements at issue therein, that (a) "due and payable"

language that appeared in such contracts meant that contingent broker fee

obligations contemplated under such contracts did not become due until the

same time that such obligations also became payable, and (b) when such

obligations became due was equivalent to the point when an indebtedness arose

with respect to such obligations.  See Transport Properties, 589 F.Supp. at 450;

Berman, 340 A.2d at 253.  Fikes argues that such holdings in Transport

Properties and Berman stand for the broad proposition that, whenever "due and

payable" language appears in a contract, an obligation contemplated under such

contract does not become due until the same time that it also becomes payable

thereunder, regardless of whether other relevant – and contrary – language

39

might also appear in such contract.  Unfortunately for Fikes, <u>Transport Properties</u>

and <u>Berman</u> cannot be cited for such a broad proposition.  A simple examination

of <u>Transport Properties</u> reveals that the <u>Transport Properties</u> court was

compelled to hold as it did only because nowhere in the contract at issue therein

did there appear any other language that would have indicated, or otherwise bore

on the issue of, when the obligation at issue therein might become due (i.e.,

when a debt might arise with respect to such obligation), *see* <u>Transport</u>

<u>Properties</u>, 589 F.Supp. at 450; without any additional relevant language to which

the <u>Transport Properties</u> court could resort, such court was, indeed, compelled to

hold that the obligation at issue therein only became due when the same became

payable.  The <u>Berman</u> court held as it did because, in addition to the "due and

payable" language that appeared in the contract at issue therein, additional

language appeared in such contract which also indicated that the obligation at

issue therein became due when the same became payable.  *See* <u>Berman</u>, 340

A.2d at 253.  Fikes' reliance on <u>Transport Properties</u> and <u>Berman</u> is misplaced

because, in contrast to the contracts before the courts in those two decisions,

additional language appears in the Letter Agreement that (a) bears directly upon

when the Fee – once again, actually that part of the Fee for any given year that

had not yet been satisfied by way of a draw to the Debtor – would become due,

and (b) dictates, in particular, that such part of the Fee would become due before

it became payable.  Such additional language from the Letter Agreement to

which the Court refers is (a) the language contained in section (a) therein, which

language, as set forth above, strongly implies that the accrual of indebtedness on

40

Fikes' part relative to the Fee is unconditional, and (b) the "due to" language contained in what looks like the second paragraph of section (b) therein, which "due to" language, as set forth above, strongly implies that Fikes unconditionally incurs a debt to the Debtor by, at the latest, the close of each of Fikes' fiscal years with respect to that part of the annual Fee that has not been paid to the Debtor throughout such fiscal year in the form of a draw.  Because of such additional language in the Letter Agreement, the Court holds (a) that the "due and payable" language appearing in the Letter Agreement, even when it is coupled with the Lender Approval Clause, does not compel a construction of such language such that Fikes' incurrence of debt relative to the Fee is conditioned upon the approval of Fikes' principal lender, and (b) instead, as a consequence, that such document unambiguously operates – or, at a bare minimum, that such document is ambiguous so that it is reasonably susceptible to an interpretation that it operates – such that Fikes unconditionally incurred a debt to the Debtor by, at the latest, the close of each of Fikes' fiscal years with respect to that part of the annual Fee that had not been paid to the Debtor throughout such fiscal year in the form of a draw.  Having so held, how does the Court then construe the "due and payable" language that appears in the same sentence of the Letter Agreement as does the Lender Approval Clause?  The Court construes such language to mean that (a) that part of the annual Fee that had not been paid to the Debtor throughout a fiscal year in the form of a draw unconditionally became due, although it did not also become payable, on the last day of such fiscal year, and (b) such amount then became *both* due *and* payable

41

on "August 15 following the end of such fiscal year, subject to the approval of Fike[]s['] principal lender."  The Court notes, as well, that its construction of such "due and payable" language is supported by the decision in L. Gregg Ivey, Inc. v. Land, 252 S.E.2d 88, 90 (Ga.Ct.App. 1979) ("due and payable" language specifies a time for payment, not the time when a debt became due; therefore, because condition was tied to "due and payable" language, only time for payment became conditioned, not accrual of debt).

The Court is also not swayed from holding as it does by (a) the mere presence in the Lender Approval Clause of the words "subject to," and (b) the existence of case authority to the effect that, whenever there appears in a contract words such as, for instance, "if," "provided that," "on condition that," or – as in the instant matter – "subject to," then what is usually intended is a condition precedent rather than a promise or covenant.  The Court will hold as it does notwithstanding the presence of the words "subject to" in the Lender Approval Clause because (a) the limiting effect that such words often connote – i.e., an effect such that a duty of performance is conditioned – may be overcome by, among other things, the (i) language in a contract that surrounds such limiting words and the would-be condition, and (ii) placement in a contract of such limiting words and the would-be condition, see, e.g., Hohenberg Brothers Co. v. George E. Gibbons & Co., 537 S.W.2d 1, 2-4 (Tex. 1976) (reading all of contract provisions together rather than in isolation from one another, and holding that, despite the presence of the limiting language "as soon as," a condition precedent was not stated in the contract), (b) of the presence in the Letter Agreement of the

42

language to which the Court just referred in the preceding paragraph herein (i.e.,

the language contained in section (a) therein and the aforesaid "due to" language

contained in what looks like the second paragraph of section (b) therein), which

language, as set forth above, strongly indicates that Fikes' incurrence of debt

relative to the Fee is not conditioned upon the approval of Fikes' principal lender,

and (c) of the fact that the Lender Approval Clause is placed in a section of the

Letter Agreement other than section (a) thereof, which placement, as discussed

above, strongly indicates that Fikes' incurrence of debt relative to the Fee is not

conditioned upon the approval of Fikes' principal lender.  The Court also holds

that, even if one were to view as limiting the words "subject to" that appear in the

Lender Approval Clause, that is that such words indicate that a condition is

expressed in the Letter Agreement, such interpretation of such words would not

dictate a construction of the Letter Agreement such that Fikes' incurrence of debt

with respect to the Fee is conditioned upon the approval of Fikes' principal

lender.  The Court so holds because, even if a condition is found to exist in a

contract, such condition, as a matter of law, need not necessarily regard the

creation of an obligation – indeed, such condition may perhaps only pertain to the

timing of performance of an already-existing obligation under such contract.  *See,

e.g.,* L. Gregg Ivey, 252 S.E.2d at 90 ("there is a distinction between a condition

to the creation of an obligation and a condition merely as to the time of its

performance"); Powell Company v. McGarey Group, LLC, 508 F.Supp.2d 1202,

1210 (N.D.Ga. 2007) (same).[11]  The Court also holds, as a matter of law, that, if

an ambiguity exists as to the type of condition that is stated within a contract (i.e.,

a condition to the creation of an obligation, on the one hand, or a condition

merely as to the time of its performance, on the other hand), then such condition

must be construed as one that pertains only to the time of performance of an

already-existing obligation; such holding is compelled because, as set forth

above at the outset of the instant part IV., the rule in Pennsylvania is that

contractual language will *not* be construed as a condition, in particular, to the

creation of an obligation if such language is in any way ambiguous in such

regard.  For all of the reasons thus far set forth herein, the Court holds that, even

if one were to interpret the words "subject to" that appear in the Lender Approval

Clause such that a condition is thereby expressed in the Letter Agreement, such

condition (a) unambiguously pertains to nothing more than the time when Fikes

would have to satisfy what then constituted fixed, existing indebtedness on its

part to the Debtor relative to the Fee, and (b) is, in any event, and under a best

case scenario for Fikes, no better than ambiguous regarding whether, on the one

hand, it pertains to the creation of an obligation on Fikes' part relative to the Fee

or, on the other hand, it pertains to the time when Fikes would have to satisfy

---

[11]If one were to construe contractual language such that it states a
condition but that such condition pertains to nothing more than such timing of
performance, then, the Court notes, such construction really amounts to nothing
more than a construction that such language describes an event the occurrence
of which marks the time when an already-existing obligation must be performed.
*See* L. Gregg Ivey, 252 S.E.2d at 90; Powell Company, 508 F.Supp.2d at 1210-
1211.

what then constituted an already-existing obligation on its part to the Debtor

relative to the Fee, which ambiguity is fatal to Fikes' cause given that, as just

explained above, such ambiguity must be resolved in favor of a construction that

such condition pertains only to the time when Fikes would have to satisfy what

then constituted an already-existing obligation on its part to the Debtor relative to

the Fee.

Finally, because the Court holds that the Letter Agreement did not make

the creation of Fikes' obligation with respect to the Fee – or actually that part of

the annual Fee that had not been paid to the Debtor throughout a fiscal year in

the form of a draw – dependent upon the approval of Fikes' principal lender, the

Court can thereby easily distinguish from the instant matter those cases that

Fikes relies on for the proposition that "a condition precedent exists if the

obligations under the contract at issue are dependant on the approval of a third-

party," *see* Fikes' Memorandum dated March 23, 2007 (Docket No. 33), at p. 16

(citing 6 cases).  As well, since the Court holds (a) that the Lender Approval

Clause did not condition the creation of Fikes' obligation with respect to the Fee –

or actually that part of the annual Fee that had not been paid to the Debtor

throughout a fiscal year in the form of a draw – upon the approval of Fikes'

principal lender, and (b) consequently that such obligation on Fikes' part was

incurred, that is such obligation accrued or became due, independent of, and

prior to the time, when Fikes' principal lender would approve payment of such

obligation, the Court can thereby easily distinguish from the instant matter those

cases that Fikes relies on for the proposition that "contractual obligations that are

45

subject to a condition precedent do not become due and do not even 'accrue'

until such time as the condition is satisfied," *see* Fikes' Memorandum dated

March 23, 2007 (Docket No. 33), at p. 17 (citing 1 case).

For all of the foregoing reasons, the Court holds that the Lender Approval

Clause does not unambiguously state a condition precedent like that which is

argued for by Fikes.  Consequently, the Court, as a matter of law, cannot

construe such clause so that it states such a condition precedent, which means

that the Trustee is entitled to summary judgment in her favor to such effect.

Because, as a matter of law, the creation of Fikes' obligation with respect

to the Fee – or actually that part of the annual Fee that had not been paid to the

Debtor throughout a fiscal year in the form of a draw – is not subject to that

condition precedent which is argued for by Fikes, that is the creation of such

obligation is not conditioned upon the approval of Fikes' principal lender, it

matters not, when resolving whether Fikes has incurred/accrued a liability to the

Debtor respecting the Fee for any period subsequent to November 1, 2000, that

Fikes' principal lender withheld its approval respecting the Fee for all such

periods.  Accordingly, Fikes, as a matter of law, has incurred/accrued a liability to

the Debtor for Fees for the period subsequent to November 1, 2000; the Court so

holds because, as set forth above, the parties agree that the Debtor performed

all of the services that were contractually required of it under the MCA while such

agreement remained operative, that is the Debtor fully performed under the MCA

for all relevant periods.

The amount of such liability for Fees for the period subsequent to

46

November 1, 2000, the Court holds, equals $1,000,000. Such amount is arrived

at by subtracting from the total amount that the Trustee seeks as damages

herein – i.e., $1,178,666 – that portion of such total damages amount that, as set

forth in Part II. of the instant opinion, is attributable to Fees for the period prior to

November 1, 2000 (more particularly, the period from late June 2000 to October

31, 2000) – i.e., $178,667.[12]  Therefore, Fikes, as a matter of law, has incurred

fixed debt with respect to Fees for the period from November 1, 2000, to

November 4, 2002 (i.e., the date when the MCA terminated), equal to

$1,000,000.

**V.      Whether the aforesaid fixed debt of $1,000,000 became both due and
        payable, that is whether such debt needed to be satisfied, when
        Fikes ceased to have a principal lender even if, prior to such
        cessation, such principal lender never approved payment of such
        fixed debt?**

Having now ruled that Fikes, as a matter of law, has incurred fixed debt

with respect to Fees for the period after November 1, 2000, equal to $1,000,000

(hereafter "the Fixed Debt"), the Court must next address Fikes' alternative

position, namely that, the existence of the Fixed Debt notwithstanding, Fikes has

thus far not breached the Letter Agreement (and thus the MCA) by refusing to

---

[12]The Court recognizes that $1,178,666 – $178,667 = $999,999. The $1
difference between $1,000,000 and $999,999 is due to rounding and, in
particular, to rounding that was involved in the calculation that yielded the
$178,667 figure. As set forth in Part II. of the instant opinion, the Court has
already determined that it shall rule that (a) Fikes is in breach of the MCA and the
Letter Agreement for not having yet paid to the Debtor, pursuant to such
agreements, the $178,667 amount, and (b) the Trustee is thus entitled to
summary judgment in her favor in at least the amount of $178,667 (plus interest,
barring any applicable setoff in favor of Fikes).

satisfy the Fixed Debt.

Fikes, as set forth above, initially so argues (a) because, it argues in turn, even the Trustee agrees that such satisfaction was, and is, not contractually required prior to the date when Fikes' principal lender authorized, or would authorize, such satisfaction, and (b) since, as Fikes points out, it is undisputed that no principal lender of Fikes has ever, even to the present time, provided such authorization.  The Trustee, as set forth above, responds to such alternative position of Fikes by arguing (a) that, although the Lender Approval Clause enables Fikes to postpone the satisfaction of the Fixed Debt until Fikes' principal lender provides authorization for such satisfaction, such postponement may last for only so long as Fikes has a principal lender, that is the Lender Approval Clause ceases to be operative once Fikes no longer has a principal lender, and (b) that Fikes ceased to have a principal lender at least as of February 29, 2004, which date is when Fikes sold all of its assets to United Dairy, Inc., and thereupon ceased doing business.  The Court, as set forth above, understands Fikes to (a) disagree with the Trustee that the Lender Approval Clause becomes inoperative on the date when Fikes would cease to have a principal lender, (b) argue instead that such clause remains operative indefinitely if Fikes ceases to, and during the period while Fikes does not, have a principal lender, and (c) even argue that, if it were to permanently cease to have a principal lender prior to such lender ever having authorized the satisfaction of the Fixed Debt, then Fikes, in accordance with such clause, would henceforth be relieved permanently from having to satisfy such debt.

48

In addition to the principles of contract law that are set out in the previous section of the instant opinion and which are used therein to resolve the "condition precedent" issue, the Court finds several other doctrines of contract law to be relevant to the contract construction arguments by the parties that are addressed in the present section of this opinion.  First,

> [e]quity, it has been said, abhors a forfeiture and is greatly hesitant to enforce one.  This is especially so where "the contract has been carried out or its literal fulfillment has been prevented by oversight or uncontrollable circumstances."  A forfeiture clause is enforceable, but only if it is expressed with clearness and certainty.  Thus, a court must review the contract in its entirety, and a provision will not be construed to result in a forfeiture unless no other reasonable construction is possible.

Kalina v. Eckert, 497 A.2d 1384, 1385 (Pa.Super.Ct. 1985) (citations omitted); see also Oxford Associates Real Estate, L.P. v. TSI Society Hill, Inc., 2007 WL 128886 at 3 (E.D.Pa. 2007) (same); 12 P.L.E.2d Contracts § 465 at 469-471 (same).  In light of the foregoing, the Court holds, as a matter of law, that, if a contractual provision is ambiguous as to whether it will effect a forfeiture, then such contractual provision shall not effect such forfeiture.  The Court also holds that, because – applying the law, as set forth above, regarding legal determinations and the appropriateness of resolving the same via a summary judgment motion – determinations as to whether unambiguous contract language effects a forfeiture, or whether contract language is ambiguous as to whether it

49

effects a forfeiture, are legal determinations that may be resolved via summary

judgment, and since such determinations will also necessarily be made without

resort to parol evidence, whether a contractual provision effects a forfeiture is

particularly appropriate for resolution via a summary judgment motion.

> Second,
>
> if the language of the contract is ambiguous and susceptible of two
>
> interpretations, one of which makes it fair, customary, and such as
>
> prudent men would naturally execute, while the other makes it
>
> inequitable, unusual, or such as reasonable men would not likely
>
> enter into, the construction which makes it rational and probable
>
> must be preferred.

Consolidated Tile and Slate Company v. Fox, 189 A.2d 228, 229-230 (Pa. 1963);

see also Heidt v. Aughenbaugh Coal Company, 176 A.2d 400, 401-402 (Pa.

1962) (same, also holding that "[i]f one construction would make it unreasonable,

while another would do justice to both parties, the latter will be adopted"); Frickert

v. Deiter Bros. Fuel Co., Inc., 347 A.2d 701, 704 (Pa. 1975) (same); Unit Vending

Corp. v. Lacas, 190 A.2d 298, 300 (Pa. 1963) (same); Empire Sanitary Landfill,

Inc. v. Riverside School District, 739 A.2d 651, 655 (Pa.Commw.Ct. 1999)

("before a court may interpret a contract in such a way as to reach an absurd

result, it must endeavor to reach an interpretation that is reasonable").  Moreover,

even though the law generally is that, "if the language of a contract [clause] is

ambiguous, [then] parol testimony is admissible to aid in its construction,"

Consolidated Tile, 189 A.2d at 230, such parol testimony must be "in consonance

with a reasonable interpretation of the relevant clause" or it will be inadmissible,

Id.; put differently, parol testimony is inadmissible to try and prove that an

ambiguous contract clause should be construed in an unreasonable fashion.[13]

Consequently, if an ambiguous contract clause is susceptible of two

constructions, one reasonable and the other unreasonable, then such clause, as

a matter of law, must be given the reasonable construction.  Because such

selection, under such circumstances, is compelled as a matter of law, such

selection (a) must be made by a court, (b) will be made without resort to parol

evidence, and (c) can accordingly be made, and indeed is a particularly

appropriate matter to be dealt with, via summary judgment.  Also, and of course,

because the determination of whether a contract clause is susceptible to two

interpretations is part and parcel of a court's legal conclusion as to whether such

clause is ambiguous, and since the determination of whether either of such

interpretations is unreasonable is for a court, a court can, as well, make those

determinations via summary judgment.

Third, unexpressed "[t]erms that are clearly implied from the language of

the contract or required to effectuate the parties' intentions constitute enforceable

contractual provisions."  Haymond v. Lundy, 2001 WL 15956 at 9 (E.D.Pa. 2001);

see also Von Lange v. Morrison-Knudsen Company, Inc., 460 F.Supp. 643, 649

(M.D.Pa. 1978) (same); 12 P.L.E.2d Contracts § 164 at 223 (same).

---

[13]The one exception that the Court can think of to the rule of law just
stated in the text immediately preceding the instant footnote is if a contract
clause is ambiguous because it is susceptible to but two interpretations, both of
which are frankly unreasonable.

Applying all of the foregoing contract law principles, the Court holds that, for four separate reasons, it must construe the Lender Approval Clause such that it becomes inoperative on the date when Fikes would cease to have a principal lender, that is such clause must be construed to not (a) remain operative indefinitely if Fikes ceases to, and during the period while Fikes does not, have a principal lender, and (b) allow Fikes to escape altogether ever having to satisfy the Fixed Debt if it were to permanently cease to have a principal lender prior to such lender ever having authorized the satisfaction of such debt.

First, the Court must construe the Lender Approval Clause as it does because, if the Court were to construe such clause in the fashion advanced by Fikes, then such clause would operate to effect a forfeiture by the Debtor of its claim, that is its fixed contractual right, to that which Fikes owes in the form of the Fixed Debt (hereafter "the Debtor's $1 Million Claim").  The Court has little trouble in holding that such clause would work such a forfeiture to the extent that it may be construed so as to permit Fikes to escape altogether ever having to satisfy the Fixed Debt (such effect to follow, according to Fikes, if it were to permanently cease to have a principal lender prior to such lender ever having authorized the satisfaction of such debt) because, if Fikes is so permitted to so escape, then the Debtor has necessarily thereby permanently lost its right to the Debtor's $1 Million Claim, which loss is, by definition, a forfeiture.  As for Fikes' construction of such clause such that it merely remains operative indefinitely if Fikes ceases to, and during the period while Fikes does not, have a principal lender, the Court must view the same as also working a forfeiture because, even

52

if the Court were to accept that such construction, at least theoretically, might not

necessarily result in a permanent loss by the Debtor of its right to the Debtor's $1

Million Claim, such construction would nevertheless, from a practical standpoint,

result in such permanent loss; such practical loss by the Debtor of its right to the

Debtor's $1 Million Claim follows because Fikes has sole control over if, and

when, it might ever get another principal lender (i.e., Fikes could, for instance,

abstain from getting another principal lender for, let's say, 67 years, or 167 years,

and Fikes could even avoid the need for such lender by not operating for such

length of time – with respect to the last point, recall that Fikes is no longer

operating although it remains a corporation in good standing).  The Court,

unfortunately for Fikes, cannot construe the Lender Approval Clause such that it

may work such a forfeiture (a) because, quite simply, such clause, under a best

case scenario for Fikes, is ambiguous as to whether it can effect such a

forfeiture, and (b) since, as set forth above, a clause, as a legal matter, cannot be

construed to effect a forfeiture if such clause is ambiguous regarding whether it

will effect such forfeiture.  The Court must hold that the Lender Approval Clause,

under a best case scenario for Fikes, is ambiguous as to whether it can effect a

forfeiture by the Debtor of the Debtor's $1 Million Claim because (a) such clause

is conspicuously silent regarding what might happen if, and when, Fikes ceases

to have a principal lender, (b) courts have held that a contract is ambiguous

regarding an issue if such contract is silent regarding such issue, *see, e.g.,* Unit

Vending Corp., 190 A.2d at 300, and (c) such clause, the Court holds, may be

reasonably construed such that Fikes must immediately satisfy outstanding

indebtedness relative to the Fee if, and when, it ceases to have a principal

lender.  Therefore, the Court must construe the Lender Approval Clause such

that it will not work a forfeiture, that is by construing such clause so that it

becomes inoperative on the date when Fikes would cease to have a principal

lender.

Second, construing the Lender Approval Clause in the fashion advanced

by Fikes is, in any event, unreasonable.  Once again, as just set forth in the

Court's discussion regarding forfeiture, if the Lender Approval Clause is

construed as Fikes wishes, then it would operate so that Fikes practically may

escape altogether ever having to satisfy the Fixed Debt.  The Court holds that

construing such clause so that it would operate to allow Fikes practically to

escape altogether ever having to satisfy the Fixed Debt is, in the first instance,

patently unreasonable, and then, as well, is unreasonable because (a) such

clause, by Fikes' own admission, was inserted into the Letter Agreement only so

as to protect Fikes' principal lender at the time when the MCA and the Letter

Agreement were executed (i.e., Congress), *not so as to protect Fikes*, *see, e.g.,*

Fikes' Memorandum dated March 23, 2007 (Docket No. 33), at pp. 2-3,[14] and (b)

---

[14]Because, "[i]n determining the meaning of a word [or words] in a
contract, the word [or words] must be taken not only in [the] context of all [of the]
language in the document, but also must be considered in the whole history of
the transaction," 12 P.L.E.2d *Contracts* § 148 at 200, the Court, in construing the
Lender Approval Clause (and the Letter Agreement), can – indeed, must –
consider the extrinsic fact that such clause was inserted into the Letter
Agreement only so as to protect Congress.  However, and of course, the Court
may, at the summary judgment stage, consider such extrinsic fact as part of such
process of construction only if such fact is not subject to a genuine dispute.
Since, as set forth in the text preceding the instant footnote, such extrinsic fact is

it would thus make little sense – indeed, it would be perverse – if Fikes could continue to benefit, forever no less, from a protection that was only intended to benefit Congress – i.e., the Lender Approval Clause – even after Congress ceased to be Fikes' principal lender.  Having held that Fikes' construction of the Lender Approval Clause is thus unreasonable regarding what happens if, and when, Fikes would cease to have a principal lender, and recognizing that such clause is then susceptible of but one reasonable interpretation in such regard, that being that such clause becomes inoperative if, and when, Fikes would cease to have a principal lender, the Court may then easily proceed to hold that such clause unambiguously becomes so inoperative.  The Court can hold that the Lender Approval Clause unambiguously becomes inoperative if, and when, Fikes would cease to have a principal lender (a) because, as just set forth, such construction of such clause is the only one that is reasonable, and (b) since, as set forth above, a contractual term is unambiguous if it is capable of but one reasonable or fair interpretation, that is if it is not susceptible of multiple reasonable interpretations.[15]

---

conceded by Fikes, that is it is undisputed, the Court may consider such fact at this time.

[15]Because the Court holds, as just set forth and independent of the Arbitration Decision, that the Lender Approval Clause is unambiguous vis-a-vis the issue of whether it becomes inoperative if, and when, Fikes would cease to have a principal lender, it does not even matter whether the Arbitration Decision would operate to collaterally estop the parties from arguing that the Lender Approval Clause is ambiguous regarding such issue.  *See* supra note 6 for a further discussion of why it does not matter whether the Arbitration Decision would have such collateral estoppel effect.

Third, because, as just set forth, Fikes' construction of the Lender Approval Clause is unreasonable regarding what happens if, and when, Fikes would cease to have a principal lender, it matters not if the Court were to hold that such clause is ambiguous in such regard, that is that such clause is susceptible of both of the diverging interpretations advanced by the Trustee and Fikes regarding what would happen if, and when, Fikes would cease to have a principal lender. A court could hold that the Lender Approval Clause is so ambiguous because (a) such clause, as set forth above, is conspicuously silent regarding what might happen if, and when, Fikes ceases to have a principal lender, and (b) courts, as set forth above, have held that a contract is ambiguous regarding an issue if such contract is silent regarding such issue. The Court holds that it would not matter, however, if a court were to hold that the Lender Approval Clause is so ambiguous (a) because, as set forth above, if a contract clause is ambiguous and susceptible of two constructions, one reasonable and the other unreasonable, then such clause, as a matter of law, must be given the reasonable construction, and (b) since, as just set forth, Fikes' construction of the Lender Approval Clause is unreasonable regarding what happens if, and when, Fikes would cease to have a principal lender. Therefore, even if the Court were to hold that the Lender Approval Clause is ambiguous regarding what happens if, and when, Fikes would cease to have a principal lender, the Court nevertheless would be constrained to construe such clause such that it becomes inoperative if, and when, Fikes would cease to have a principal lender.

Finally, even though the Lender Approval Clause is silent regarding what

might happen if, and when, Fikes ceases to have a principal lender, that such clause becomes inoperative on the date when Fikes would cease to have a principal lender is, in light of all of the foregoing, both clearly implied from the language of the MCA and the Letter Agreement and required to effectuate Fikes' and the Debtor's intentions regarding such agreements.  Because, as set forth above, unexpressed terms that are clearly implied from the language of a contract or required to effectuate the parties' intentions regarding such contract constitute enforceable contractual provisions, an unexpressed but eminently enforceable term in the Letter Agreement to the effect that the Lender Approval Clause becomes inoperative if, and when, Fikes would cease to have a principal lender must be found to exist.

Because the Lender Approval Clause becomes inoperative if, and when, Fikes would cease to have a principal lender, the Trustee is correct that the Fixed Debt became both due and payable, that is that such debt needed to be satisfied, by at least February 29, 2004 – i.e., the date when Fikes sold all of its assets to United Dairy, Inc., and thereupon ceased doing business – if Fikes, by such date, ceased to have a principal lender.  Such holding brings the Court to Fikes' other alternative argument (or, perhaps more accurately, its second reason in support of its alternative argument to the effect that it has thus far not breached the Letter Agreement (and thus the MCA) by refusing to satisfy the Fixed Debt), namely that, in any event, it did not need to satisfy the Fixed Debt by at least February 29, 2004, or, for that matter, that it need not yet satisfy such debt, because, contends Fikes in turn, Fikes has had a principal lender since February 29, 2004

57

(which date, as set forth above, is the latest date when Congress would have

constituted Fikes' principal lender).

**VI.**     **Whether Fikes has had a principal lender since February 29, 2004?**

Fikes contends that it has had a principal lender since February 29, 2004,

and that such principal lender is Protein Holdings.  Protein Holdings, as set forth

above, was, and is, the majority shareholder of Fikes, who, in turn, has continued

to exist as a corporation in good standing under the laws of the Commonwealth

of Pennsylvania notwithstanding that it ceased to be operational after February

29, 2004.

The Trustee, as set forth above, disagrees with Fikes that Protein

Holdings can constitute "Fikes' principal lender," as that term is used in the

Lender Approval Clause.  The Trustee also contends, as set forth above, that (a)

"Fikes' principal lender" denotes only an outside lender, that is a lender who is

independent of, and thus unaffiliated with, Fikes, and (b) Protein Holdings, far

from being such an independent lender to Fikes (if it has even lent to Fikes), is

Fikes' majority shareholder.  The Court, as set forth above, understands Fikes to

disagree that the language "Fikes' principal lender" must refer to an entity who is

independent of, and thus unaffiliated with, Fikes.

Applying all of the contract law principles set forth throughout the instant

opinion, the Court holds that, for four separate reasons, it must construe the

language "Fikes' principal lender" such that it only means an outside lender, that

is a lender who is independent of, and thus unaffiliated with, Fikes.

First, the Court must construe the language "Fikes' principal lender" as it

58

does because, if the Court were to construe such language as Fikes wishes, that

is so that such language can refer to Protein Holdings, then the Lender Approval

Clause would operate to effect a forfeiture by the Debtor of its right to the

Debtor's $1 Million Claim.  The Court so holds because, if such language were

construed like Fikes wishes, then the Lender Approval Clause would operate so

that Fikes' parent company – i.e., Protein Holdings – could dictate if and/or when

it wished for Fikes to satisfy the Fixed Debt.  If the Lender Approval Clause is

determined to work so that Fikes' parent company would have such power, that

is sole control over if and/or when it wished for Fikes to satisfy the Fixed Debt,

then, from a practical standpoint, the Debtor will never get paid, that is the Debtor

has permanently lost its right to the Debtor's $1 Million Claim; such permanent

loss by the Debtor of its right to the Debtor's $1 Million Claim is, by definition, a

forfeiture of such right.  Consequently, construing the language "Fikes' principal

lender" to encompass Fikes' parent company works a forfeiture by the Debtor of

the Debtor's $1 Million Claim.  The Court, unfortunately for Fikes, cannot

construe such language so that the Lender Approval Clause may then work such

a forfeiture (a) because such language, and the remainder of the Lender

Approval Clause as well, is, under a best case scenario for Fikes, ambiguous as

to whether it can effect such a forfeiture, and (b) since, as set forth above,

contractual language, as a legal matter, cannot be construed to effect a forfeiture

if such language is ambiguous regarding whether it will effect such forfeiture.

The Court must hold that the language "Fikes' principal lender," under a best

case scenario for Fikes, is so ambiguous because (a) such language is

59

conspicuously silent regarding, on the one hand, whether it denotes only an

outside lender or, on the other hand, whether it encompasses an entity who is

affiliated with Fikes, (b) courts, as set forth above, have held that a contract is

ambiguous regarding an issue if such contract is silent regarding such issue, and

(c) such language, the Court holds, may be reasonably construed such that it

refers only to an outside lender, that is a lender who is independent of, and thus

unaffiliated with, Fikes.  Therefore, the Court must construe the language "Fikes'

principal lender" such that it will not work a forfeiture, that is by construing such

language so that it can only mean an outside lender, that is a lender who is

independent of, and thus unaffiliated with, Fikes.

Second, construing the language "Fikes' principal lender" in the fashion

advanced by Fikes is, in any event, unreasonable.  Once again, as just set forth

in the Court's discussion regarding forfeiture, if such language is construed as

Fikes wishes, then the Lender Approval Clause would operate so that Fikes'

parent company, in its sole discretion, could decide if and/or when Fikes will

satisfy the Fixed Debt.  The Court holds that construing the language "Fikes'

principal lender" so that the Lender Approval Clause would operate to vest in

Fikes' parent company such discretionary control is, in the first instance, patently

unreasonable, and then, as well, is unreasonable because (a) such clause, as

set forth above, was, by Fikes' own admission, inserted into the Letter

Agreement only so as to protect Fikes' principal lender at the time when the MCA

and the Letter Agreement were executed (i.e., Congress), *not so as to protect

either Fikes or Fikes' parent company*, and (b) it would thus make little sense –

60

indeed, it would be perverse – if either Fikes or its parent company could

continue to benefit, forever no less, from a protection that was only intended to

benefit Congress – i.e., the Lender Approval Clause – even after Congress

ceased to be Fikes' principal lender.  Having held that Fikes' construction of the

language "Fikes' principal lender" is thus unreasonable, and recognizing that

such language is then susceptible of but one reasonable interpretation, that

being that it can only refer to an outside lender, that is a lender who is

independent of, and thus unaffiliated with, Fikes, the Court may then easily

proceed to hold that such language is unambiguous in such regard.  The Court

can hold that the language "Fikes' principal lender" unambiguously refers only to

an outside lender (a) because, as just set forth, such construction of such

language is the only one that is reasonable, and (b) since, as set forth above,

contractual language is unambiguous if it is capable of but one reasonable or fair

interpretation.[16]

Third, because, as just set forth, Fikes' construction of the language

"Fikes' principal lender" is unreasonable, it really does not matter if the Court

were to hold that such language is ambiguous, that is that such language is

---

[16]Because the Court holds, as just set forth and independent of the
Arbitration Decision, that the Lender Approval Clause is unambiguous vis-a-vis
the meaning of the language "Fikes' principal lender" (i.e., whether such
language can only refer to an outside lender, that is a lender who is independent
of, and thus unaffiliated with, Fikes), it does not even matter whether the
Arbitration Decision would operate to collaterally estop the parties from arguing
that the Lender Approval Clause is ambiguous regarding such issue.  *See* supra
note 6 for a further discussion of why it does not matter whether the Arbitration
Decision would have such collateral estoppel effect.

susceptible of both of the diverging interpretations advanced by the Trustee and

Fikes.  A court could hold that the language "Fikes' principal lender" is so

ambiguous because (a) such language, as set forth above, is conspicuously

silent regarding, on the one hand, whether it denotes only an outside lender or,

on the other hand, whether it encompasses an entity who is affiliated with Fikes,

and (b) courts, as set forth above, have held that a contract is ambiguous

regarding an issue if such contract is silent regarding such issue.  The Court

holds that it would not matter, however, if a court were to hold that the language

"Fikes' principal lender" is so ambiguous (a) because, as set forth above, if

contractual language is ambiguous and susceptible of two constructions, one

reasonable and the other unreasonable, then such language, as a matter of law,

must be given the reasonable construction, and (b) since, as just set forth, Fikes'

construction of the language "Fikes' principal lender" is unreasonable.  Therefore,

even if the Court were to hold that the language "Fikes' principal lender" is

ambiguous, the Court nevertheless would be constrained to construe such

language such that it can only refer to an outside lender, that is a lender who is

independent of, and thus unaffiliated with, Fikes.

Finally, even though the language "Fikes' principal lender" is silent

regarding, on the one hand, whether it denotes only an outside lender or, on the

other hand, whether it encompasses an entity who is affiliated with Fikes, that

such language refers only to an outside lender, that is a lender who is

independent of, and thus unaffiliated with, Fikes is, in light of all of the foregoing,

both (a) clearly implied from such language, as well as the other language of the

62

MCA and the Letter Agreement, and (b) required to effectuate Fikes' and the

Debtor's intentions regarding such agreements. Because, as set forth above,

unexpressed terms that are clearly implied from the language of a contract or

required to effectuate the parties' intentions regarding such contract constitute

enforceable contractual provisions, an unexpressed but eminently enforceable

term in the Letter Agreement to the effect that "Fikes' principal lender" only refers

to an outside lender, that is a lender who is independent of, and thus unaffiliated

with, Fikes, must be found to exist.

Because the language "Fikes' principle lender" must be construed such

that it only means an outside lender, that is a lender who is independent of, and

thus unaffiliated with, Fikes, Protein Holdings could not have constituted Fikes'

principle lender on or after February 29, 2004. Consequently, Fikes has not had

a principle lender since at least February 29, 2004, since (a) Congress, at least

after February 29, 2004, was no longer Fikes' principal lender, (b) Fikes, in

defense of the Trustee's summary judgment motion, has never asserted that it

had another outside, unaffiliated lender, let alone another outside, unaffiliated

principal lender, and (c) Fikes, at least as of the present time, does not have an

outside, that is an independent, unaffiliated lender, let alone such a principal

lender.


**VII.    <u>Summary.</u>**

Because Fikes has not had a principle lender since at least February 29,

2004, and since the Lender Approval Clause becomes inoperative if, and when,

63

Fikes would cease to have a principal lender, the Fixed Debt became both due

and payable, that is such debt needed to be satisfied, by at least February 29,

2004.  Because Fikes has not yet satisfied – indeed, Fikes, as of the present

time, continues to refuse to satisfy – the Fixed Debt, Fikes thereby has breached,

and remains in breach of, the Letter Agreement (and thus the MCA).

Consequently, the Trustee is entitled to summary judgment in her favor for the

amount of the Fixed Debt – i.e., $1,000,000.

As set forth in Part II. of the instant opinion, Fikes is also in breach of the

MCA and the Letter Agreement for not having yet paid to the Debtor, pursuant to

such agreements, $178,667, which amount represents unpaid Fees for the

period prior to November 1, 2000 (more particularly, unpaid Fees for the period

from late June 2000 to October 31, 2000).  The Trustee is thus entitled to

summary judgment in her favor for that amount as well.

Accordingly, the Trustee is entitled to summary judgment in her favor for

the total amount of $1,178,666,[17] plus interest on such amount at the rate of 6%

from March 1, 2004 (i.e., the first day after February 29, 2004).  Such decision, of

course, is subject to any applicable setoff in favor of Fikes; as set forth above,

the parties, given the Court's instant decision that the Trustee is entitled to

---

[17]As an aside, the Court notes that it utilizes herein the undisputed, but
extrinsic, financial statement information set forth in the instant Statement of
Facts only so as to resolve issues regarding the amount of damages that
emanate from Fikes' breach of the MCA and the Letter Agreement.  Such
financial statement information, as can be seen from the Court's analysis in parts
IV. – VI. of the instant opinion, is not considered by the Court when it undertakes
construction of the MCA and the Letter Agreement.

summary judgment in her favor, agree that Fikes is also entitled to a $252,448.44

offset against such summary judgment.  Therefore, the Trustee is entitled to

summary judgment in her favor for the net amount of $926,217.56, plus interest

on such amount at the rate of 6% from March 1, 2004.

## CONCLUSION

In light of the foregoing analysis, the Court reinstates its prior decision in

favor of the Trustee as embodied in the Judgment Order, excepting for the

Court's determination therein that the Trustee's Count 1 is a core proceeding.

Therefore, the Court grants the Trustee's partial summary judgment motion,

which means that the Trustee prevails on her Count 1.  The Court, at the same

time, denies Fikes' cross-motion for summary judgment with respect to the

Trustee's Count 1.  By virtue of prevailing on her Count 1, the Trustee is entitled

to net contract breach damages of $926,217.56, plus interest at the rate of 6%

from March 1, 2004.

An appropriate order will be entered.

**BY THE COURT**

  **/s/**
**M. BRUCE McCULLOUGH,**
**U.S. Bankruptcy Judge**

**DATED:      April 9, 2008**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **DAIRY CONSULTING, INC.,** | : | |
| | : | **Bankruptcy No. 04-23238-MBM** |
| Debtor. | : | |
| ......................................................... | : | ................................................................. |
| **Natalie Lutz Cardiello, Chapter 7** | : | |
| **Trustee for the Estate of Dairy** | : | |
| **Consulting, Inc.,** | : | **Chapter 7** |
| Plaintiff, | : | |
| | : | |
| v. | : | **Adversary No. 06-2365-MBM** |
| | : | |
| **Fike's Dairy, Inc., f/k/a R. Bruce** | : | |
| **Fike & Sons Dairy, Inc.,** | : | |
| Defendant. | : | |

## ORDER OF COURT

**AND NOW,** this **9th day** of **April, 2008**, upon consideration of (a) the

motion for partial summary judgment brought by Natalie Lutz Cardiello, the

Chapter 7 Trustee for the bankruptcy estate of Dairy Consulting, Inc., the instant

debtor (hereafter "the Trustee"), whereby the Trustee moves for summary

judgment with respect to her Count 1, and (b) the cross-motion for summary

judgment respecting such Count 1, which cross-motion is brought by Fike's

Dairy, Inc. (hereafter "Fikes"), the instant defendant;

and given the Court's Judgment Order dated July 12, 2007 (hereafter "the

Judgment Order"), whereby the Court (a) ruled in the Trustee's favor on her

Count 1, that is the Court thereby granted the Trustee's partial summary

judgment motion and denied Fikes' cross-motion for summary judgment, and (b)

awarded to the Trustee contract breach damages of $926,217.56, plus interest at

the rate of 6% from March 1, 2004;

and in light of the District Court's Memorandum Order dated November 1, 2007, whereby, subsequent to appeal, the Judgment Order was vacated and the instant matter was then remanded so that this Court could explain the reasons for the Judgment Order;

and for the reasons set forth in the accompanying Memorandum Opinion of the same date,

it is **hereby ORDERED, ADJUDGED, AND DECREED** that:

(a)     the Court's prior decision in favor of the Trustee as embodied in the Judgment Order, excepting for the Court's determination therein that the Trustee's Count 1 is a core proceeding, is **REINSTATED IN ITS ENTIRETY**;

(b)     the Trustee's partial summary judgment motion is, therefore, **GRANTED**, which means that the Trustee prevails on her Count 1;

(c)     Fikes' cross-motion for summary judgment with respect to the Trustee's Count 1 is thus **DENIED WITH PREJUDICE**; and

(d)     the Trustee, by virtue of prevailing on her Count 1, is entitled to – and thus Fikes shall pay to the Trustee – net contract breach damages of **$926,217.56, plus interest at the rate of 6% from March 1, 2004**.

**BY THE COURT**


   **/s/**
**M. BRUCE McCULLOUGH,**
**U.S. Bankruptcy Judge**

2

copies to:

Scott M. Hare, Esq.
Bartony & Hare, LLP
Law & Finance Building, Suite 1801
429 Fourth Avenue
Pittsburgh, PA 15219

George J. Marcus, Esq.
Marcus, Clegg & Mistretta
100 Middle Street
Portland, ME 04101

Mark E. Freedlander, Esq.
McGuire Woods LLP
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, PA 15222